```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3
 4    RAFAL RUDNICKI,                    )
                                         )
 5    Plaintiff;                         )
                                         )
 6    -VS-                               ) CAUSE NO.
                                         ) 04 C 5719
 7    WPNA 1490 AM, ALLIANCE             )
      COMMUNICATIONS, INC., POLISH       )
 8    NATIONAL ALLIANCE OF THE           )
      UNITED STATES OF NORTH             )
 9    AMERICA, SLAWOMIR BIELAWIEC        )
      and WALDERMAR LADA,                )
10                                       )
      Defendants.                        )
11
12
13            The discovery deposition of RAFAL RUDNICKI, taken
14    before JENNIFER DUNN, RMR, CRR, and Notary Public, pursuant
15    to the Federal Rules of Civil Procedure of the United States
16    District Courts, pertaining to the taking of depositions for
17    the purpose of discovery, at 333 West Wacker Drive, Suite
18    300, in the City of Chicago, Cook County, Illinois,
19    commencing at 10:00 a.m., on October 16, 2006.
20
21
22
23
24
```

```
1                    APPEARANCES:

2        THE GLEASON LAW GROUP, P.C.
         BY:  NANCY J. GLEASON, ESQ.
3             njg@gleasonlaw.us
                 AND
4             LUKASZ R. CHOLODECKI, ESQ.
              lrc@gleasonlaw.us
5             4653 North Milwaukee Avenue
              Chicago, Illinois 60630
6             (773) 282-6500
              (773) 282-4011 (fax)
7
                 On behalf of the Plaintiff;
8
         MANDELL MENKES, LLC
9        BY:  ALEXIS PAINE, ESQ.
              apaine@mandellmenkes.com
10            333 West Wacker Drive, Suite 300
              Chicago, Illinois  60606
11            (312) 251-1000
              (312) 251-1010 (fax)
12
                 On behalf of the Defendants.
13

14
         REPORTED BY:  JENNIFER L. DUNN, RMR, CRR
15

16

17

18

19

20

21

22

23

24
```

```
1    BY MS. PAINE:

2         Q.    Is it accurate to say that section 2 of the

3    agreement provides that you are to prepare the reports in

4    Brussels?

5              MS. GLEASON:  Objection, document speaks for

6         itself.

7              You can answer.

8              THE WITNESS:  In Brussels and in other places,

9         in other locations.

10   BY MS. PAINE:

11        Q.    And where are your reports that you prepared for

12   Radio Zet that you prepared?

13        A.    The European Commission and the European

14   Parliament and at the Council of Ministers.

15        Q.    What city?

16        A.    In Brussels.

17        Q.    Are all of the reports that you've prepared for

18   Radio Zet, were they prepared in Brussels?

19        A.    No, not all of them.

20        Q.    And what other locations have you prepared

21   reports for Radio Zet?

22        A.    In Luxembourg, Strasbourg.  There's the

23   headquarters of the European Parliament in France.

24        Q.    Anywhere else?
```

1      A.      Strasbourg.

2      Q.      Anywhere other than Luxembourg and Strasbourg?

3      A.      And in places where I were (sic) sent to, for

4   example, in Rome.

5      Q.      And how do you prepare these reports or

6   correspondence for Radio Zet?

7      A.      I go to the press conferences and I record the

8   ministers speeches.  And then my material is based on that.

9      Q.      And what do you mean by material, your material?

10      A.      Correspondences.

11      Q.      Do you mean like a report, a written report?

12      A.      Yes.

13      Q.      And how do you prepare your written reports?

14      A.      So I prepare verbal, oral reports for the radio.

15      Q.      Do you first type them out or write them out in

16   some way before you orally present them?

17      A.      It varies.  Sometimes I do it straight from my

18   head and sometimes I just write it down.

19      Q.      When you say "straight from your head," what do

20   you mean by that?

21      A.      Without having written it down, I just broadcast

22   it.

23      Q.      And you mean you broadcast it live or do you

24   record it and then it's broadcast?

1       A.      It varies.

2       Q.      So sometimes you will prepare a written report

3    that you will read and record and then is that recording

4    then played on the radio waves?

5       A.      I mean, I record it myself.

6       Q.      And how do you record the reports yourself?

7       A.      I use a mike and a minidisk.  That's a device

8    that records sounds.

9       Q.      Like a dictaphone?

10              MS. GLEASON:  I'm going to object to the

11          characterization, but . . .

12   BY MS. PAINE:

13      Q.      I'm just trying to understand what he's talking

14   about, that's all.

15              MR. CHOLODECKI:  It's -- I think he said

16          minidisk.

17              INTERPRETER:  Mini disk.

18   BY MS. PAINE:

19      Q.      Like a tape recorder that's your own?

20      A.      Yes.

21      Q.      And then that report that you recorded on your

22   minidisk, is that what is then played on to the Radio Zet

23   web site?

24      A.      First, it's broadcasted live on the radio and

1    then can be -- and then it can be -- it can become a part of

2    the web site.

3         Q.    Okay.  So you -- after you've recorded the

4    reports on your minidisk --

5              INTERPRETER:  Could you repeat the question?  I

6         just missed it.

7    BY MS. PAINE:

8         Q.    After you have recorded your report on your

9    minidisk initially, where is it next played?

10        A.    It's the news program.  It's in the Radio Zet

11   news program.

12        Q.    So it's then next -- it's played into the radio

13   and then what you're saying is that that report then becomes

14   available on the web site, correct?

15        A.    Yes.  Some of the materials can be found on the

16   Internet.

17        Q.    And between the time you record the reports on

18   your minidisk, how much time passes between that reporting

19   and the time it's broadcast on to the radio station,

20   typically?

21        A.    It's really difficult to answer this question.

22   Sometimes it may be five minutes and sometimes it may be an

23   hour and sometime it may be happening live at the same

24   moment.

1      Q.     And what do you mean by live at the same moment?

2      A.     Because there -- there may be reports that have

3   never been recorded.  They have never been recorded on

4   minidisk but they're -- but they are directly broadcasted by

5   the radio.

6      Q.     So will you do, like, a live report that's

7   immediately available?

8      A.     That's why I mentioned at the beginning that

9   there are two types of correspondences.

10     Q.     I see.  Do you know how long does it take for

11  one of your live reports, let's say, to get onto the Radio

12  Zet web site?  Is it instantaneous or is there a certain

13  period of time between the initial broadcast and the

14  availability on the web site?

15     A.     It's real difficult for me to answer this

16  question because it depends on the subject.

17     Q.     And what is, like, the shortest turnaround time

18  between you broadcasting live a report and it appearing on

19  the Radio Zet web site?

20     A.     I'm not able to estimate a time frame because I

21  don't -- I don't monitor what's happening on that Radio Zet

22  web site.

23     Q.     Fair enough.  Under the 2003 agreement you have

24  with Radio Zet, are you required to identify yourself in any

1    particular way with your reports?

2              MS. GLEASON:  I'm just going to object to the

3         extent the document speaks for itself.  But you can

4         answer.

5              THE WITNESS:  At the end of each correspondence,

6         I identify myself.

7    BY MS. PAINE:

8         Q.    And are you required to say that you're

9    affiliated with Radio Zet?

10        A.    I -- what I say is, From Brussels Rafal

11   Rudnicki, Radio Zet.

12        Q.    Do you always say "Radio Zet" at the end of your

13   correspondences?

14             MS. GLEASON:  And I'm going to object to the

15        form, but you can answer if you can.

16             THE WITNESS:  Yes.

17   BY MS. PAINE:

18        Q.    And do you do so because you feel obligated to

19   do that under the 2003 agreement?

20        A.    Yes.

21        Q.    Turning to Section 5 of the agreement, I'm going

22   to ask the interpreter to read that into the record.  That

23   begins with --

24             INTERPRETER:  License?

```
 1              As you sit here today, is it your plan to

 2    continue to sell the reports that you prepare pursuant to

 3    your agreement with -- 2000 agreement with WNVR -- I'm

 4    sorry.  Let me strike that.

 5              As you sit here today, is it your intention to

 6    continue to sell the reports you prepare pursuant to your

 7    agreement, 2003 agreement with Radio Zet to WNVR in the

 8    future?

 9         A.    Yes.

10         Q.    Has anyone from WNVR told you that they don't

11    want to accept your reports any more for whatever reason?

12         A.    No.

13         Q.    The reports you prepare for Radio Zet, is it all

14    of your work, or do other people contribute to the reports

15    that are ultimately broadcast on Radio Zet?

16         A.    No.  It's exclusively my work.

17         Q.    And do you use any of the Radio Zet equipment to

18    prepare or record the reports that you prepare?

19         A.    Some of the equipment that I use is my own and

20    some belongs to Radio Zet.

21         Q.    And what equipment of Radio Zet's do you use to

22    prepare the reports?

23         A.    A minidisk and a microphone.

24         Q.    When you broadcast your reports live, how does
```

1    that work?  How do you do that?

2         A.     It could be over the phone, could be done over

3    the phone or we have a special device which is called "call

4    deck" for transmissions like that.

5         Q.     And what percentage of the reports that you

6    prepare for Radio Zet would you say are broadcast live?

7         A.     Because I prepare so many of them, I'm -- I am

8    unable to tell how many are broadcasted live.

9         Q.     I don't need to know how many.  I'm just

10   wondering if the majority of your reports are live?

11        A.     What do you mean, "live," broadcasted live?

12        Q.     I think before you distinguished between reports

13   that you prepare and then record and are broadcast later

14   versus reports where you report live and it's immediately

15   broadcast through the radio station and I'm wondering what

16   the breakdown is between those two types of reporting,

17   whether it's more live reports versus prerecorded reports.

18             MS. GLEASON:  So you're excluding the ones that

19        he said that will go on five minutes later?

20             MS. PAINE:  That's prerecorded.

21             MS. GLEASON:  Okay.  So you're talking about a

22        simultaneous is what --

23             MS. PAINE:  Live simultaneous versus

24        prerecorded.

```
 1                    MS. GLEASON:   Okay.  I think that might be a
 2          better word to use.
 3                    THE WITNESS:   So as I said before, it's
 4          difficult for me to give you a precise answer.
 5     BY MS. PAINE:
 6          Q.    Is it 50/50?
 7                    MS. GLEASON:   If you know.
 8     BY MS. PAINE:
 9          Q.    Well, I mean --
10          A.    I don't know.
11          Q.    Okay.  Last year, for example, based upon the
12     reports that you prepared, the universe of the reports for
13     Radio Zet, would you say more or less of them were live
14     versus prerecorded?  I don't need a number.  I just need to
15     know generally.
16          A.    I don't remember how it was in 2005 --
17          Q.    And what is it like in 2006, same question?
18                    MS. GLEASON:   Objection, asked and answered.
19                    THE WITNESS:   -- preferred.
20     BY MS. PAINE:
21          Q.    You can answer.
22          A.    It's difficult for me to say how many.
23          Q.    Okay.  Let's say last -- last week.  Did you
24     submit both live and prerecorded reports to Radio Zet?
```

```
 1        A.      Yes.

 2        Q.      And can you give me any idea of the breakdown

 3    between that?  Let's say if you have ten, were five of them

 4    prerecorded and five live?

 5        A.      It's hard for me to be precise.

 6        Q.      I don't want you to be precise.  Generally.

 7                MS. GLEASON:  You know what, we've gone beyond

 8            precise and generally, so I'm going to object to the

 9            question.  He said he can't answer the question.

10                MS. PAINE:  What is your objection?

11                MS. GLEASON:  I'm going to instruct him not to

12            answer the question.  He says he can't answer it.

13                MS. PAINE:  He can't give me the general

14            breakdown of the forms of his reporting?

15                MS. GLEASON:  He said he cannot.  That's his

16            answer.

17                MS. PAINE:  All right.  Then I will abide by

18            that.  I just find that very hard to believe.

19                MS. GLEASON:  Counsel, I'm going to object to

20            you --

21                MS. PAINE:  Withdrawn.

22                MS. GLEASON:  -- making these anecdotal remarks

23            insulting remarks, in fact, on the record.

24                MS. PAINE:  Withdrawn.  I apologize.
```

1    BY MS. PAINE:

2        Q.    I have a question.

3              MS. GLEASON:  I need the question back.

4              MS. PAINE:  Do you want me to repeat it back?

5              MS. GLEASON:  Yeah.

6              THE WITNESS:  Yes, go ahead, please.

7                        (Record read as requested.)

8              MS. GLEASON:  Objection, form, asks for a legal

9        conclusion.  You can answer.

10             THE WITNESS:  So my understanding of the

11       agreement with Radio Zet is that if I broadcast the

12       correspondence from Brussels and I am the author of

13       that correspondence and I prepare it from the beginning

14       to the end and if I broadcast it to radio Zet, then

15       Radio Zet can make a decision whether they want to

16       broadcast it at 3:00 p.m. or 5:00 p.m.

17   BY MS. PAINE:

18       Q.    And that's without your input, correct?

19             INTERPRETER:   excuse me.

20   BY MS. PAINE:

21       Q.    That's without your input or permission?

22             MS. GLEASON:  What's without your input?

23   BY MS. PAINE:

24       Q.    The decision to rebroadcast.

```
 1          A.      So the person who emits or broadcasts the

 2    information decides at what time that information will be

 3    broadcasted on the radio.

 4          Q.      Okay.

 5                  MS. GLEASON:  Take five minutes, two minutes.

 6                          (Recess.)

 7    BY MS. PAINE:

 8          Q.      Going back to your first amended complaint, on

 9    paragraph 14 it refers to your allegation that the

10    defendants, "Deliberately altered either plaintiff's by line

11    or signer to read as if plaintiff's news report was

12    specifically done on behalf of WPNA 1490 or have read his

13    news reports on the air without plaintiff's by line or

14    signer in a deliberate attempt to make it appear as if the

15    news report was written and produced by the staff of WPNA

16    1490 AM."

17                  INTERPRETER:  I just have to ask one thing, by

18          line and signer, what does it exactly mean?

19                  MS. PAINE:  I can explain it.  It's basically

20          like the beginning part or ending part, something that

21          identifies your name to the work that's being

22          broadcast.  That's my understanding.

23                  INTERPRETER:  Okay.  I just have to read it to

24          myself first.
```

1     BY MS. PAINE:

2          Q.     Well, my question is, I'm not sure what you mean

3     by deliberately altered the by line or signer.

4          A.     So my understanding is that if it's a signer of

5     my correspondence from Brussels, so I specifically identify

6     myself as Rafal Rudnicki from Brussels Radio Zet and if the

7     authors of the program just happen to cut out that signer

8     where I -- I identified myself and when they're presenting

9     my correspondence, when they are broadcasting my

10    correspondence, they indicate that I'm their correspondent

11    even saying as a by line that Rafal Rudnicki is in Brussels

12    or Rafal Rudnicki from Brussels or even by saying directly

13    that our correspondent, Rafal Rudnicki is in Brussels.  And

14    then they subsequently broadcast that correspondence and I

15    think that this is a deliberate -- that by doing that, they

16    deliberately confuse the audience or mislead the audience.

17         Q.     I don't want to cut you off.

18         A.     Okay.  I'm done.

19         Q.     Are you aware of any instances where WPNA played

20    one of your reports and did not attribute the report to you?

21         A.     Yes.  I'm aware of situations like this.

22         Q.     When were those reports?

23                INTERPRETER:  Pardon me?

24

1      BY MS. PAINE:

2           Q.     When were those reports broadcast?

3           A.     I think it's -- I can refer to both the reports

4      from 2004 and some occurrences from the last -- from the

5      previous month, from the previous few weeks.

6           Q.     Do you have any dates for those broadcasts?

7           A.     But I'm not able to tell you that.  I don't

8      remember the dates.

9           Q.     For the record, we have not been provided any

10     specific dates or reports from this present year that

11     allegedly were infringed by WPNA.

12          MS. GLEASON:  For the record, yes, you were.  We

13          tried to get in to listen to those tapes all summer,

14          Ms. Paine.

15          MS. PAINE:  You interrupted me.

16          MS. GLEASON:  No, no, no, no, no.  You're not

17          going to say something for the record --

18          MS. PAINE:  Let's go off the record then.  Let's

19          just --

20          MS. GLEASON:  No.  I'm on the record.  I'm on

21          the record.  And, yes, you were informed that there

22          were a number of breaches that occurred this last

23          summer and you got a letter from my office advising

24          you.

```
 1                MS. PAINE:  From this -- from 2006?

 2                MS. GLEASON:  From 2006.

 3                MS. PAINE:  I have never seen a letter until

 4       Lukasz called me last week and I was equally concerned

 5       when I got your phone call.

 6                MR. CHOLODECKI:  You -- I believe you first

 7       received a letter from Nancy and then you called me

 8       about the new infringements.

 9                MS. PAINE:  Alleged infringements.  This is a

10       dispute that we can take on this record but I think

11       it's something that's irrelevant to this issue.  All

12       I'm trying to establish in the record is why I'm asking

13       certain questions about infringements of which I don't

14       know the specific dates about.  We can fight until

15       we're red in the face about the situation with respect

16       to coming in and listening to the tapes which we've

17       made available to you on two occasions and the last of

18       which was a week before the deposition.

19                I never prevented you before, but I was never

20       asked since the time you went in, in 2005, until last

21       week when you guys went back if you could have access

22       to the tapes and I've never denied you access.

23                MR. CHOLODECKI:  Well, the -- we asked about I

24       believe it was probably six or seven weeks ago and we
```

```
 1          were denied access for, I think, three or four weeks.
 2                MS. GLEASON:   To the point that I had to call a
 3          partner here in the law firm and ask him for
 4          cooperation.
 5                MS. PAINE:   That is not accurate.
 6                MS. GLEASON:   Be that as it may, the point is,
 7          we advised you that we just very recently found out
 8          about very recent violations.
 9    BY MS. PAINE:
10          Q.    That's all I'm trying to establish is the fact
11    that I just learned last week and that's why I'm apologizing
12    for not being able to specifically refer to dates or times.
13    But what I wanted to know was if you had any information you
14    could provide me with about those reports.
15          A.    No, because I received the information in
16    Brussels when I was in Brussels and it was, again, from
17    my -- from Kamila Ceren, from my boss at WNVR 1030 who told
18    me that one of her employees heard correspondence
19    broadcasted on WPNA radio station and that the person said
20    that it -- that according to her, it could have been me but
21    she wasn't sure of that because there wasn't -- there wasn't
22    any by line or signer contained in that report.  So the host
23    or the authors of that news service that were -- that was
24    broadcasted didn't identify the author of those
```

1    correspondences.

2    BY MS. PAINE:

3        Q.    And have you been able to since verify that it

4    was, in fact, your news reports that were played in the past

5    couple weeks on W -- 1490?

6        A.    So at first I didn't believe that at all.  I

7    said that it must be some misunderstanding and it's not

8    possible.  I said that it was just unbelievable that

9    somebody would have tried my materials again behind my back

10   and without my knowledge or permission two years after the

11   first infringement.

12       Q.    My question to you is, have you since then

13   verified that's those news reports were, in fact, yours?

14   And I mean the reports that you mouth most recently learned

15   about.

16       A.    Yes.  I heard that three -- that those three

17   materials which I mentioned at the beginning of the

18   deposition.

19       Q.    But have you listened to them and have you

20   determined that it was, in fact, your voice?

21       A.    I listen to them and without any problem I

22   recognize that it was my voice.

23       Q.    And where did you listen to them?

24       A.    At the law offices of Lukasz Cholodecki.

1    copyrights?

2            MS. GLEASON:  Objection, asked and answered,

3        form.

4            THE WITNESS:  Because I didn't give them any

5        permission to use my materials.

6    BY MS. PAINE:

7        Q.    That's different -- that's not answering the

8    question.  Do you have knowledge that any person such as

9    Mr. Bielawiec or Mr. Lada or any person affiliated with PNA,

10   Alliance Communications, 1490, that they had the intent to

11   take your works and deprive you of your copyrights by

12   playing your reports on 1490 AM?

13           INTERPRETER:  I don't know how to be more

14       efficient.

15           MR. CHOLODECKI:  Yeah.  I think it's getting

16       lost in translation here.

17           THE WITNESS:  Because I didn't have any contact

18       with them, so I didn't have a chance to speak with them

19       about their intent or their plans.

20   BY MS. PAINE:

21       Q.    Okay.  Have you -- strike that.

22           Is there any system in Poland of which you're

23   aware that you can register your copyrights to create a

24   record of your copyrights?

1        A.      I'm not aware of that.  I'm not aware -- that's

2    possible that a system like that exists, but I'm not aware

3    of that.

4        Q.      So you have not, as far as you know, registered

5    any of your copyrights if a system exists in Poland or any

6    of your works, correct?

7        A.      How it works in Poland is that if somebody is an

8    author of something that automatically he holds the rights

9    to that work.

10       Q.      Have you ever made any registration of your

11   copyrights here in the United States with the copyright

12   office?

13       A.      In August when I found out that somebody

14   listened -- that someone listened to possibly -- to

15   something that was possibly my correspondence but without

16   knowing for a fact that it was me -- but because I couldn't

17   believe that, that it could repeat itself, that situation

18   could repeat itself, I decided just in case to register --

19   to register my work.

20       Q.      And what have you registered with the U.S.

21   copyright office?

22       A.      I've registered my -- I don't know -- I don't

23   know exactly which legal term I should use, my copyrights or

24   authorship rights.  I registered my work.

1       Q.      With the U.S. copyright office?

2       A.      Yes.

3       Q.      And when was this registration?

4       A.      In August but I just -- I cannot point the

5    specific date.  For sure it was after somebody had said that

6    possibly they listened or heard my correspondences

7    broadcasted on the radio.

8       Q.      And which of your works did you register with

9    the U.S. copyright office in 2004?

10              MS. GLEASON:  I'm going to -- I'm going to

11         object to the extent you're assuming that has to be on

12         a specific basis, so -- and it calls for a legal

13         conclusion.  But you can answer.  You can answer if you

14         can.

15              MS. PAINE:  I don't understand your objection.

16              MS. GLEASON:  There's -- there's assumptions in

17         there that I think make the question vague.

18              MS. PAINE:  Which assumptions?

19              MR. CHOLODECKI:  That you have to register --

20              MS. GLEASON:  A specific work.

21              MR. CHOLODECKI:  -- a specific work.

22              MS. PAINE:  I'm not saying you have to.  He's

23         saying he did and I'm wondering what is it he

24         registered.  I'm not inferring anything other than

```
 1          that.  I just want to know which reports to which he's

 2          referring that he registered.

 3                  THE WITNESS:  It's hard for me -- it's hard for

 4          me to say specifically which reports they were.  They

 5          were just several reports that I made.

 6     BY MS. PAINE:

 7          Q.    And did you have any legal assistance in helping

 8     to register these works with the U.S. Copyright Office

 9     without inferring any discussions you had with your

10     attorneys?

11                  MS. GLEASON:  Yes or no question.

12                  THE WITNESS:  No.

13     BY MS. PAINE:

14          Q.    I'm sorry, no?  Yes?

15          A.    No.

16          Q.    Did you inform your attorneys that you had made

17     these registrations?

18          A.    Yes.  I told them that I submitted an

19     application or . . .

20                  MS. PAINE:  Off the record.

21                        (Discussion off the record.)

22     BY MS. PAINE:

23          Q.    Okay.  So the registrations you're referring to

24     were in August 2005 when you discovered --
```

1          A.     2006.  Yes.

2          Q.     '06.  Sorry.  I'm confused because you said when

3      I first learned and I thought that --

4                  MS. GLEASON:   Repeat.

5                  THE WITNESS:   Um-hmm.

6      BY MS. PAINE:

7          Q.     Have you received any response back to your

8      application for copyright protection from the U.S. Copyright

9      Office?

10         A.     I haven't received -- I haven't received any

11     response as of the date of when I was leaving for United

12     States.

13         Q.     And do you have a copy of the paperwork that you

14     submitted to the U.S. Copyright Office?

15         A.     No.

16         Q.     Does anyone have a copy of the correspondence to

17     the U.S. Patent Office?

18         A.     No.

19         Q.     Are you able to request a copy of what you

20     submitted to the U.S. Copyright Office?

21         A.     I don't even know because I don't know the

22     procedures of the United States.

23                 MS. PAINE:   I'd request on the record that you

24             submit or obtain and submit the records relating to

```
 1            your U.S. copyright applications to your attorneys in

 2            this case for production pursuant to your continuing

 3            obligation to update and supplement your interrogatory

 4            answers and production requests.

 5                 MS. GLEASON:   That requires -- that requires no

 6            response from you.   Your request is noted.

 7                 MS. PAINE:   Thank you.   I appreciate it.

 8                           (Rudnicki Exhibit No. 4

 9                           marked for identification.)

10       BY MS. PAINE:

11            Q.   I'm going to give to you Exhibit 4, which is

12       your motion for partial summary judgment submitted in this

13       case.

14                 And if could you turn to -- it's Exhibit 1 to

15       the actual statement of material facts.   Have you seen this

16       document -- have you seen this document before?

17                 INTERPRETER:   Which page is he on?

18                 MS. PAINE:   It's the affidavit.   It's not really

19            a page.   It's Exhibit No. 1.

20                 THE WITNESS:   My signature is on it, so I must

21            have seen it before.

22       BY MS. PAINE:

23            Q.   You don't have a specific recollection of having

24       seen it, though?
```